Next case is 06-1542, Enkel Corporation v. Procter & Gamble. Mr. Hutz, whenever you're ready. Your Honor, in this case, Enkel's contemporaneous laboratory notebook records demonstrated that the detergent tablets constructed according to the count possessed the required solubility differences. And although the technicians who did the work and a non-inventor supervisor, Dr. Jaski, testified that they regularly shared and reported their laboratory results to the inventors, and that although the inventors, Dr. Holderbaum and Dr. And that indeed reported those results to other inventors by April 1997. Well, in this case, we have a situation where the appreciation issue is at the reduction of practice stage, not at the conception stage. That's correct. What is the burden of proof? Burden of proof to establish appreciation or ponder the evidence. So it's not clear and convincing evidence. That's correct, Your Honor. So it's a lower burden of proof. It's a lower burden. That's correct. And that is where I think the board made its mistake. Tell us where they did make that error. Well, I think they made multiple errors. But they evaluated the evidence not with what we think is the preponderance of the evidence standard, but rather with a much harsher standard. And what they basically said was that because certain testimony wasn't given, they focused on what the inventor and the technical people didn't say. They failed to focus on what they did say, and they failed to focus on whether or not what was said was sufficient under the appropriate burden of proof. The only purported defect in Hankel's proofs found by the board was this lack of appreciation. Everything else was either assumed or found by the board. Counsel? While I recognize this is something we look at for a preponderance of the evidence, it's also a question of fact. Reduction of practice is a question of law, but appreciation is a question of fact. And the board found, as a matter of fact, no appreciation. So what is our standard of review? Because if it was de novo, I think you'd have me. But that's my problem. It's not de novo, so I'm not sure how to approach it. Well, I believe it's the subsidiary facts that underlie the legal conclusion of an actual reduction of practice, I believe, are reviewed under the substantial evidence rule. That's what I'm hung up on, to be honest with you, because I'm having difficulty how I can say the board's fact-finding is not supported by substantial evidence, even though if I got to decide it myself, I might agree with you. Well, then let's review the evidence, because after all, the evidence of appreciation is really why we're here today. First of all, we have to understand the inventor's background. They are PhDs. They're working in the detergent area. If they didn't think solubility was important, they wouldn't have asked that solubility be evaluated. And having been interested in solubility and having directed and instructed their first technician to study solubility and then another laboratory run by Dr. Jaskin to do solubility tests, which he did, they have asked for that solubility. The data that is generated in connection with those tests undisputedly demonstrates the required differences in solubility between the compressed portion on the one hand and the melt or the non-compressed portion on the other. The testimony by the technicians is that they did the work, that they regularly shared the results and discussed that with, for example, Dr. Holuboff. The inventors testified that they contemporaneously recognized that the tablets had the desired solubility characteristics that were claimed in Henkel's applications. Now, that necessarily, when we say what was claimed in Henkel's applications and we look at the count, that includes the differential solubility between the compressed and the non-compressed portion. Mr. Hutz, your adversary seems to make much of a distinction between solubility and dissolution rate, and I'm having a hard time understanding or appreciating the distinction. Is there any distinction between the two? Well, in the sense that solubilities of each involve a question of time and involve a question of, shall we say, weight or apparent disappearance of mass. If you look at the counts, the count is broad. It doesn't require anything other than there be a differential between the rate of dissolution or solubility. It doesn't have a specific test. It doesn't say by how much, and it doesn't require a particular, shall we say, measuring technique and or result, a number of grams per minute. So all you have to have to meet the count, and in particular, one of the claims within the count is claim 41, and that's a good illustration. It talks about a detergent tablet. We're talking about the whole tablet. We're saying it has a compressed area. We're saying it has a melt or non-compressed area. And we're saying that in that tablet, the dissolution rate of the compressed region is greater than the dissolution rate of the solidified solution or melt region. So having said that, you can determine that by an observation. But an appreciation of a differential in solubility, I take it, is the same as an appreciation of a distinction in dissolution. I would think so, Your Honor, if you're talking about the same time period, which we are here. Because if we look at the results by the technicians, we look at Schulich at first. He put the tablet, as required by the count, into a pre-wash cycle. So that tablet and its compressed area and its non-compressed area were subjected to the same conditions, the same time, the same temperature profile. He observed that the core, which is the non-compressed or the melt region, did not significantly dissolve. At the same time, he observed and recorded that the ring, which was the compressed area, did dissolve by a discernible amount. I think it was 8 grams. When you have that observation right there, and particularly for a Ph.D. chemist, which the inventors were, who were interested in solubility and gave the instructions to test for solubility, the result of that observation, which was communicated, is that there is a differential in the rate at which the melt or non-compressed dissolves, hardly at all, versus the compressed, which is the ring, which was to an amount of 8 grams. It seems to me that the essential thrust of this whole development effort, and correct me if I'm wrong, was to develop a product that would provide for some detergent capability throughout the complete washing cycle, so that the product was not completely dissipated or used during the pre-wash, and that there was some that remained for the washing cycle. From that perspective, it's not surprising that through the course of this, there might not be some specifically articulated discussion about, ah-ha, there's a dissolution rate, or we've discovered a differential dissolution rate. It seems to me that was the whole point, was it not? Well, the whole point was to, of course, remember to make the ring tab with the melt and all the rest, and determine what its properties were, including, critically, the solubility properties, which were asked for both Slowicka and Majek, the other technician who did the work. And if there wasn't a differential in the disability rates, then the product would not serve the function for which it was intended. Well, I don't know if I can go that far. I don't think there's record support one way or the other for that, Your Honor, frankly. But I'm just making a generalization in terms of sort of the overall thrust of this whole development effort. The overall thrust was to develop ring tabs that would allow you to put some of the ingredients into the melt, fill it into the compressed area, and then vary the properties of the ultimate product. Remember the invention record that we looked at talked about specifically the ability to vary the solubility properties. In fact, if you look at the Henkel application, it allows it to go either way. Either the ring is more soluble or, I should say, dissolves at a faster or a slower rate. The reason we have the count the way it is is because that comes from the Proctor and Gamble application, which had the requirement of the count. But that was the idea behind the whole notion of using two different compositions was a difference in solubility so that you would have, you know, detergent in the wash cycle for a longer period of time. That was one of the properties that they wanted. Yes, I won't say it was the sole one, but yes, that was one of the properties. But that is the type of instruction to do the solubility testing that the inventors instructed their technicians to do. It's very clear. Both the technician testifies to that as well as the inventors. You did testify that they were instructed to do solubility testing, but, I mean, I didn't get the sense that Mr. Shlawicka was instructed to test the difference between the two, but rather instead instructed to test the overall solubility, like there remains detergent for 40 minutes into the wash cycle or something like that. Is that, am I reading it wrong? No, I don't think you're necessarily reading it wrong. What I'm saying is he was instructed to determine solubility. Even if you assume there was no conception prior to the actual observation of the results so that you have a simultaneous conception and actual reduction to practice, that actual reduction to practice date is six months prior to Proctor's earliest possible date. So we've not argued in order to make this appeal simple a prior conception, nor do I believe we have to because the results of the testing, which everybody agrees was reported to the inventors. I don't think that he's going to agree with that when he stands up in your shoes. I think he's going to say, and maybe I'm wrong, but I think he's going to say that there's no evidence that that observation was reported to the inventors because all the declarations say is that the results were reported and there's no evidence that Holderman read the lab notebook or that that particular one-sentence observation in a lengthy lab notebook was, in fact, conveyed to him. They're talking only about a few pages, Your Honor. And look at the context of the declarations. They're not talking about a big, long laboratory notebook. They're talking about the context of those pages. And those results were shared. And Holderman says he remembers them. Bogine says he remembers them. But he says he remembers them sharing results. But does he say he remembers them sharing a differential dissolution rate between the two? Precisely no. The issue is by a preponderance of the evidence, is that sufficient to carry the burden to establish appreciation when the results themselves clearly show that result? Solubility is an issue. Why would they ask first for Slowicki to do solubility and second to ask Najek or Najek's boss to do the solubility? If these people, these inventors who are PhDs and working in there, were not interested in the results of the solubility, why did they ask for them the first time? Why did they ask for them the second time? The key here is that those results, a mere observation, Slowicki made an observation. That observation necessarily meant that the compressed area dissolved faster than the melt area. And he testifies, as does Holderman, that those results were given to him, given to the inventor. That is a communication, I submit, by a preponderance of the evidence. Then why didn't Holderman say so in his declaration? You could have, at any point, or any of the inventors could have said, I was aware of a differential dissolution, but they didn't. Their declarations are phrased much more ambiguously than that. You're focusing on what he could have said and I'm focusing on what he did say and what the other people said and whether that's enough under a preponderance of the evidence rule. I think that's the proper focus of the boards. That's what the boards should have focused on. Mr. Hauntz, you're well into your rebuttal time. We will add a few minutes to it. We'll give you four minutes back. Thank you very much. You may proceed. May it please the court, my name is Mark Charles, counsel for the FLE, the Parker & Gamble Company, P&G. P&G is asking the court to uphold the decision by the board in finding that there is no appreciation by the named inventors specifically as to the dissolution rate element. Does that have to be a specific understanding of that? Do I have to sit down and say, well, the dissolution rate was five parts per million per minute? No. No, Your Honor. It does not require a specific understanding. As you'll see, I will explain as to the type of dissolution. Go ahead. I'm sorry. I'm sorry. The board interpreted dissolution under its broadest reasonable interpretation. And we feel that under that interpretation by the board, there is enough showing to find that there was no appreciation by anyone. Well, could it be a visual determination also? As far as a visual determination. A dissolution. This is a little donut type. It's not rocket science, is it? This is a soap tablet which is made up of two separate aspects. One dissolves faster than the other. It's almost like a donut. The outside part of the donut dissolves faster than the inside part. Yes, Your Honor, but I think that the confusion that occurs here is that the term dissolution rate by Hankel is being proffered to say it dissolves before. If something dissolves faster, it dissolves before. Allow me to give an example. Take a hard candy, if you will, a dual-layer candy, a candy having a soft middle and a hard outside, like a Tootsie Pop. If you took a Tootsie Pop and you decided to eat this Tootsie Pop and you're sucking on it, the outer hard shell begins to dissolve. Eventually, it all dissolves and you're left with the soft center portion. Under the Hankel analysis, they're saying that then the hard portion would dissolve faster than the soft portion. Okay, so you build an inverted Tootsie Pop with a soft portion on the outside and a hard portion on the inside. And you were sucking it and the soft shell began to dissolve. Then what you're left with is the hard portion. And again, under the Hankel analysis, what you're left with is to say that the soft shell now dissolves before the hard shell. So as you can see, their construction of dissolution rate is very much dependent upon these things being stuck together, this tablet and the milk portion that they have. It depends on this geometry, not the dissolution rate of the individual components. But they rejected Schweiker's testimony or his test reports because he did not specifically measure the dissolution rate. Yes, Your Honor. I asked you before, was that dissolution rate specifically required to be measured? Or could it be visually seen? The measurement of the dissolution rate is, in this case, I think you have to be measured. I think that there's enough complexity here that there may be some requirement for measurement. If you're talking about making a visual observation, particularly in light of having a tablet that has both phases put together, that observation is going to be tainted by the positioning of both the milk region and the compressed region together. Trying to make a determination or for one's ordinary skill to look at a tablet or to look at some construction and say that this region clearly has a faster or higher dissolution rate than the other region does not account for the problems that are caused by taking these things together. So, counsel, am I understanding right? I thought that if Schlewicker's observation and Nesjik's test results had been communicated to the inventors, that there would be no question they had appreciation of the dissolution rate count element. Are you saying no? That even if everything that they have said was in fact definitely without question communicated to the inventors, that that still wouldn't be enough to appreciate the count limitation? Yes, Your Honor. And the reason that I'm saying this is because at no point was any type of purpose for determining dissolution rate ever discussed in the Hinkle evidence. I know Hinkle proffers that dissolution rate can have various other names. But you don't claim a purpose for the dissolution rate difference in your count? No, what I mean is, what I mean by that, Your Honor, is that for Hinkle's testing, to be looking for dissolution, Hinkle, when they're performing their testing, at no point do they indicate that dissolution rate is even an interest to them. They talk about other physical properties, but there is nowhere in the testimony, nowhere in the data evidence where they indicate that they're interested in dissolution rate. They do discuss the tablet dissolving and dissolving in a dishwashing machine, and we understand that, but there's no point do they address dissolution rate. But nothing in your claim addresses dissolution rate either. It just says the compressed dissolves faster than the non-compressed. So why should we make them appreciate something that you don't have in your count? Well, we talk, dissolution rate, the terms in the count that we have in our claim, we define how dissolution rate is to be used, and we offer, you know, as one of ordinary skill in the art, two things. One, we talk about dissolution rate in our patent. Two, Hinkle's own expert in the second Blasey Declaration also indicates what dissolution rate is or how one of ordinary skill would interpret dissolution rate. Now, what we're saying is that even under the broadest possible determination for dissolution rate, what you're faced with is that they do not show any interest or evidence in finding appreciation. Okay, but they have test results from Neswick, I'm sure I'm saying that wrong, and from Mr. Schloenka that are you saying that those test results do not show or observe a compressed portion that dissolves at a faster rate than a non-compressed portion? I think what those test results show that for that particular tablet, the compressed portion may have dissolved at a faster rate than the non-compressed portion, but the issue is whether the compressed portion that they have, that interference is actually causing a faster dissolution rate. Again, I think the question here is whether the compressed portion dissolves before the non-compressed portion, not that it has a faster dissolution rate. And again, here where we have is you have the compressed portion that they have and it dissolves merely before as it's positioned such that the milk composition on top of it, there could be surface area or other types of things that prevent one from being able to determine, in fact, which has the faster dissolution rate similar to the candy example that I gave earlier. But counsel, your claim doesn't read to a geometry, so it's not limited to an instance where both the compressed and the non-compressed portions are simultaneously exposed such that we can tell there's a true dissolution rate between the chemicals as opposed to a dissolution rate differential based on the geometry. I agree with you that there could be a distinction there, but that's not what your claim or your count calls for. Your Honor, well, if you were looking toward then the specification, that's why we were very clear in talking about how we go about taking a dissolution rate as one of ordinary skill in the art would so that you eliminate things such as, you know, surface area and other things that may come into play, which is why we believe that in order to determine dissolution rate, you know, putting these things in various combinations, any one of ordinary skill could cause one to dissolve before the other. But for the actual determination of the dissolution rate, these things have to be separated and measured independently so that you do not have things like surface area issues creep up into the determination. But Mr. Charles, you just, at the beginning of the presentation, you said that the actual dissolution rate was not necessary. I'm sorry, the actual? Dissolution rate was not necessary. What I'm saying by that is that if you had two equal, if you had two portions, a compressed portion and a non-compressed portion, sitting by themselves, and you placed those in water, and the non-compressed portion dissolved before the compressed portion, in that situation, giving a proper test, you can see clearly that the non-compressed portion would have dissolved before the compressed portion. It's not a requirement that that would then have to be measured. What I am saying is that in this situation, we don't even get to that because of perhaps the shape, because of the way that this is added. We cannot clearly determine, at least based on the testimony and based on the record, what dissolution rate is. And not having that particular, not being able to make that determination as to whether they even were aware of the concept of dissolution leads us to that they did not have appreciation for the invention. Mr. Charles, Mr. Shulawika's declaration, and I'm looking now at appendix page 243, shows that he says he noted that the core did not dissolve in the pre-wash, but that the non-compressed portion lost 8 grams. So not only is that a reflection of the fact that one dissolved before the other, but it shows a difference in dissolution rate, because one had a rate of 8 grams over time, etc., and the other didn't dissolve at all, so it had a zero rate. Well, again, Your Honor, I ask that you consider the presence of this centralized melt core within the tab. If this core is surrounded by non-compressed portion and in water, then the non-compressed portion, because it's going to be in contact with the water, is going to dissolve before you get to the melt region. Is there anything to suggest that that is, in fact, the configuration? As this being a ring tab? Yes. I believe that the testing was done on ring tabs for bihangle, that the melt portion was placed... But the melt portion was in the middle of the ring and was exposed. There was some level of exposure, yes, Your Honor. And here the test results show that whatever that level of exposure, it did not dissolve at all during the pre-wash, whereas the other portion did. So there's a difference in dissolution, and not only a difference in terms of one dissolved before the other, but a difference in dissolution rate. Your Honor, there are two things that I'd like to say in response to that. One is that while we have this tablet and that you do end up with some of the melt portion that's left over, there are issues then around the non-compressed portion dissolving because it's in contact. The other issue, which is the other part of the argument that I'd like to proffer forward, is that there's no evidence then that that particular communication was then given to the inventor such that they appreciated the results that they got. I don't... There's testimony that the results were given and that Dr. Holderbaum was well aware of the activities of Mr. Sluika and results. Well, as the board suggested, those generalized statements that we look at the evidence and we review the evidence, P&G fields does not amount to a preponderance of the evidence. Again, working with someone and engaging in work on several different, many different activities, it's impossible to see that this particular communication occurred such that the inventors got that. Furthermore... I know what you're saying, but if you look at the sentence preceding what I just read, this is... Is it Dr. Holderbaum or Mr. Holderbaum? I believe it's Dr. Holderbaum. Dr. Holderbaum. He says, referring to Mr. Sluika's work, he also tested the ring tabs, etc., etc., and found that the ring tab partially dissolved, but that the solidified milk filling did not dissolve. That's a specific reference to the test results that we were talking about a moment ago. He goes on to say he supervised Mr. Sluika and was well aware of his activities and results. And isn't that enough on a preponderance basis? Your Honor, for the reasons I discussed, again, involving things like the geometry and the inability for us to go back and determine what the dissolution rate of those individual components were, the compressed portion and the non-compressed portion, The specific dissolution rate is not important. It's the fact that there's a differential. But determining that differential dissolution rate when you are not approaching both sides evenly, we don't see any indication where one can determine the differential dissolution rate when you don't have a test such that you can compare evenly one substance with the other substance. Well, what about the notebook pages from Nesjet's notebook, which are listed at 833? There's a table there. Tabs weight, ring tabs with surfactant smelt, showing a distribution in prewash and afterwash of 22%. Yes, Your Honor. Isn't that an indication of a dissolution rate? If it starts at 32 and ends at 25, go right ahead. It's 833 of the joint appendix. And you were discussing the... The table, the tabs weight. Well, here, in looking at this table, to evaluate the data, there is a ring tab without filling, and then they also compared it with the ring tab with the... With surfactant smelt. With the surfactant smelt. And if you look at the absolute numbers, the ring tab without filling is around 29 grams. The ring tab with the smelt is about 35.25 grams. And then there is a measurement as far as how much of that non-compressed portion dissolved. And I think that you'll find that the ones without filling were able to achieve, again, more dissolution for the... As far as the tabs are concerned, because, again, the way that these tabs are designed, there's water that's able to get to now all sides, including the middle of the particular ring tab, whereas with the tab having the smelt that's in place, there is some... The water is not able to get to those central portions of this tab. Moreover, the non-compressed portion of the tab protects the melt region in that area from being wetted as well and thus prevents some dissolution. The point being is that there are other factors here such that this does not clearly delineate in the mind of P&G a dissolution rate. Thank you, Mr. Charles. Thank you. Mr. Hutch? Thank you, Your Honor. If the court can turn to A59, the joint appendix, you will see there the... and 60, the claims that are part of the count. Remember, each one of these claims can conform to the count. And if we look at the bottom, the claim 41 of the U.S. application of Henkel, we see that it's to a detergent tablet, that it has a compressed region and it has a non-compressed or melt region. And the requirement of the count is that the compressed region, not the material or the chemicals from which the compressed region is made, should have a dissolution rate greater than the dissolution rate of the solidified solution or melt region. Again, we are talking, and this is, I think, a fatal defect in Proctor's position, we are talking about a tablet with regions. We are talking about which region, not the material of the region, but which region dissolves faster than the other. And in the test of Slowicka and Nijic, that's exactly what they showed. They showed Slowicka for an example. It was a fully formed tablet subjected to the same extent and temperature and time and everything else. The compressed region dissolved 8 grams worth. The non-compressed or melt did not significantly dissolve. That's a test in the tablet. The count does not require why there is this differential. It could be because of a difference in surface. But that's entirely within the scope of this count. What has been argued by Proctor today is the same claims construction that they tried before the Board and the Board rejected, and it's an improper claims construction. They're trying to take the limitations from the claim at the top of A-59 and move those into the other two claims that came from Henkel's application. And the Board rejected that claims construction and the language that I just referred your honors to supports the claims construction that the Board reached and the claims construction that Henkel espouses here. This is not complex rocket science, as was stated. This is an observation that can be made. It's a recorded observation in a laboratory notebook, two laboratory notebooks to be sure. These technicians were following the directions of the inventors. The inventors were interested in solubility. The testimony is they shared those results. They looked at those results. And the testimony is also by the inventors that they appreciated that the test results showed that the solubility was as desired. What was the desired solubility? If you look at Holderboom's declaration and how it starts out, he's talking about the invention of the applications of Henkel. And those claims are the ones that we saw there from the count, and they have the differential solubility. That's the solubility in the context of these declarations that people are talking about. And the results that were communicated are in context the results of the laboratory notebooks, the few pages, and we're not talking a lot of them. There's two pages or three pages from each. Those are the results that were shared. And when we look at the declarations of the inventors and we look at the declaration of Jeske, who is a non-inventor supervisor, what we see is that in each instance they indicate that the observation was made about the compressed area dissolving faster than the non-compressed. They juxtaposed that against the fact that this was the expected solubility and it was observed and they were satisfied that those results proved that the invention worked in the manner that they had anticipated. And what were those results? Like we've said all along, not rocket science, simple observation. Those results were, in accordance with the count, that the compressed area dissolved faster than the non-compressed area. To me, there's more than a preponderance of the evidence and the board, by focusing on what they didn't say, failed to focus on what they did say and erred, we say grievously, when we ask the court to reverse. Thank you, Mr. Hutz. Case is submitted. Thank both counselors. All rise. The court is adjourned until tomorrow morning at 10 a.m.